UNION NATIONAL BANK OF CHICAGO, Appellant, vs. CROSS and another, Respondents.

*May 24 — June 23, 1898.*

(1, 4) *Promissory notes: Extension of time for payment: Pleading: Definiteness.* (2) *Jurors: Supplying deficiency in panel: Immaterial error.* (3, 5) *Wrongful attachment: Claim for damages: Pleading and practice: Measure of damages.*

1. In an action upon promissory notes, an answer alleging that, for a valuable consideration, the time of payment had been extended beyond the time of the commencement of the action, should, on plaintiff's motion, have been made more definite and certain by stating whether the agreement of extension was in writing, what the consideration therefor was, and when it was paid.

2. A deficiency of jurors for the term should, under sec. 2537, R. S. 1878, as amended by ch. 126, Laws of 1895, be supplied by drawing names from the box containing the names of petit jurors for the year; but where, in such a case, the court directed the summoning of jurors from the county at large, and the only objection made was to the

Union National Bank of Chicago vs. Cross and another.

issuing of the special venire to the coroner instead of to the sheriff, and there is nothing to show that the party objecting was injured by the method adopted for filling the panel, the irregularity is not ground for reversal of the judgment.

3. Sec. 2747, S. & B. Ann. Stats., does not require the defendant to plead a claim for damages resulting from attachment of his property, but leaves the procedure to the sound discretion of the court. The trial of the issue as to such damages together with the main issue in this case is *held* not to have been an abuse of discretion; but the better practice, it is said, would be to try the main issue first, and then, if the defendant succeeds, to take up and dispose of his claim for damages.

4. An oral agreement between the payee and the makers of notes, by which the latter were to turn over to the payee a quantity of lumber and logs, and were to saw the logs into lumber at once, and to sell all the lumber as fast as they could in the usual course of their business during the following year, and apply the proceeds upon the notes, and the payee was to extend the time of payment of the notes until they could be so paid out of the proceeds of the lumber, is too indefinite and uncertain as to the time of payment to constitute a valid extension. *Moulton v. Posten,* 52 Wis. 169, distinguished.

5. Where property kept for use and not for sale — in this case buildings, machinery, etc., used in manufacturing lumber — has been wrongfully attached, damages may be recovered for the loss of its use and for any injury to it by wear or tear or negligent care while in the hands of the officer, but, in the absence of malice, there can be no recovery for supposed loss of profits from the interruption of business, nor can the owners, under the guise of depreciation in value, recover for injuries to their business, credit, and reputation resulting from bankruptcy.

APPEAL from a judgment of the circuit court for Douglas county: A. J. VINJE, Circuit Judge. *Reversed.*

This is an action to recover upon promissory notes aggregating over $31,000. The answer admitted the execution of the notes, but alleged that the time for the payment of the same had been extended for a valuable consideration.

The defendants were manufacturers of lumber at two small railway stations, called Hawthorne and Holmes, in Douglas county, Wisconsin. At the time of the commence-

ment of the action the plaintiff made affidavit for attachment on the ground that the defendants were nonresidents of the state, and the sheriff seized upon the writ a large amount of personal property, consisting of sawmills and other buildings upon leased land, machinery, lumber, slabs, logs, horses, camp outfits, merchandise, etc., amounting to more than $30,000 in value by the inventory, and comprising practically the entire plant of the defendants at each of their sawmills.

After service of the answer, a motion was made in due time to cause the answer to be made more definite in certain particulars, which motion was overruled, and the plaintiff excepted.

The case was tried in November, 1896, the question of damages upon the attachment being tried, against the plaintiff's objection, with the main issue. A special verdict was rendered by the jury as follows: " (1) Did plaintiff extend the time of payment of the notes upon which this action is brought? *A.* Yes. (2) If you answer 'Yes' to question numbered one, then was the time of payment extended up to and including November 20, 1895? *A.* Yes. (3) What sum of money will compensate defendants for the damages they have sustained by reason of the attachment proceedings in this case? *A.* $18,550." Upon this verdict, judgment for the defendants for the amount of damages found by the jury was rendered, and the plaintiff appeals.

For the appellant there was a brief by *Dickinson, Kennedy & Graham,* and oral argument by *S. N. Dickinson.*

For the respondents there was a brief by *W. J. Turner* and *Ross, Dwyer & Hanitch,* and oral argument by *Mr. Turner* and *Mr. W. D. Dwyer.*

WINSLOW, J.    The points made by the appellant will be considered in their natural order.

1. The action was upon promissory notes.    The defense

Union National Bank of Chicago vs. Cross and another.

was that the time of payment had been extended. The allegation of the answer setting up the extension was as follows: "These defendants, further answering said complaint, allege that a short time prior to the commencement of this action the said plaintiff, for a valuable consideration paid to it by the said defendants, did extend the time of payment on each of the said notes, and that there was nothing due to said plaintiff upon any of said notes at the time of the commencement of this action, for the reason that the term of credit extended to the said defendants upon said note had not expired at the time of the commencement of the said action." Timely motion was made by the plaintiff to require the answer to be made more definite and certain by stating whether the agreement of extension was in writing, what the consideration for the agreement was, and when it was paid, but the motion was overruled. We think the motion should have been granted. The plaintiff was clearly entitled to know the nature and terms of the alleged agreement of extension, in order that it might be ready to meet the proof offered upon the trial. *Ready v. Sommer*, 37 Wis. 265. As this judgment must be reversed for other reasons affecting more closely the merits of the litigation, it is not necessary to decide whether the denial of the motion alone would necessarily require reversal of the judgment, but it is sufficient to say that the motion should have been granted.

2. A question is raised as to the impaneling of the jury. The case was tried in November, 1896, at an adjourned session of the August term. At the time of the adjournment one juror only had been retained. When court met in November this case was called, and the defendants claimed that there had been an oral stipulation that the coroner should summon the jury, but this was denied by the plaintiff's attorneys; whereupon the court asked them if they had any personal objection to the coroner summoning the jury except that it was out of order, to which they replied, "No,

sir; no personal reason." Thereupon the court made an order reciting that the sheriff had such interest in the case that he was an improper person to select jurors, and ordered that a special venire issue to the coroner, and to this order plaintiff excepted. A special venire was then issued to the coroner, directing him to summon twenty good and lawful men to serve as petit jurors for the term. The coroner obeyed the command, and summoned twenty jurors, and from the panel so obtained a jury was called for the case, and, after several challenges, was sworn and acted without further objection. It is now claimed by the plaintiff that the deficiency of jurors should have been supplied by drawing the names from the box containing the names of petit jurors for the year, under R. S. 1878, sec. 2537, as amended by ch. 126, Laws of 1895, instead of obtaining them in the manner adopted.

Doubtless the position so taken is right. The statutes governing the subject — R. S. 1878, sec. 2537 (as amended by ch. 126, Laws of 1895), and sec. 2538 — very clearly provide two different methods of obtaining additional jurors during the term to meet two different contingencies: (1) When there is an entire absence of jurors, or when the regular panel is deficient in numbers, then the deficiency is to be supplied by drawing names from the box containing the names of petit jurors for the year, and these jurymen, when summoned, become jurors for the remainder of the term; (2) when, however, it is not necessary to fill up the panel of jurors for the term, but when on account of challenges, or perhaps on account of one or two trial juries being engaged in the jury room, it becomes impossible to obtain enough jurors from the panel in attendance to try a given cause, then the court may require an officer to call from the bystanders or summon from the county at large enough talesmen to complete the panel *for such trial,* and these men, when summoned and accepted, become jurymen for that case only, and not for the term.

In the present case there was a deficiency of jurors for the term, and the attempt was made to partially fill the panel, and so the venire states that the twenty men are to be summoned to serve as petit jurors at the August term, and hence the case fell within the first contingency above named, and the names should have been drawn from the box. However, no such objection was at any time made by the plaintiff. The only objection made seems to have been an objection to the coroner's summoning the jury instead of the sheriff; certainly the attention of the court was in no way called to the claim now made. Sec. 2881, R. S. 1878, provides that a verdict shall not be set aside for irregularity in summoning or impaneling the jury unless the party was injured by the irregularity, or unless the objection was made before the return of the verdict. There is nothing in the case to show that the plaintiff was injured by the method adopted in this case, and the objection was not made before the return of the verdict; hence the judgment cannot be reversed on this ground.

3. The answer contained no claim by the defendants for damages resulting from the attachment, nor was any written claim made therefor, but the defendants were allowed, against objection, to introduce evidence on the subject, in connection with the evidence on the main issue of extension of the time of credit, and both issues were thus tried together. It is claimed that this was erroneous, and that the claim should be made by pleading, so that the plaintiff may be apprised before trial of what he has to meet; or, if this be not necessary, then it is claimed that the question of damages should not be tried until the main issue has been settled by the jury. There is certainly much force in the argument in favor of the plaintiff's claim. It seems but fair that he should know before proceeding to trial on the main issue that he will be called upon also to meet a claim for damages, and it may well be that the introduction of a large

mass of testimony on the question of damages would seriously interfere with a fair consideration by the jury of the question on the main issue. We have been referred to no decision settling the practice in such cases, nor does the statute lay down any fixed mode of procedure. The statute on the subject (sec. 2747, S. & B. Ann. Stats.) says: " If on the trial of the action the jury find for the defendant, or the plaintiff be nonsuited, they shall specially assess the damages sustained " by reason of the taking and detention of the property attached, etc. This language certainly does not indicate that a formal pleading is required, but rather that the plaintiff must be ready to meet a claim for damages when he goes to trial. Doubtless the procedure is designedly left to the sound discretion of the trial court, which is not subject to review except where it appears that the discretion has been abused, and we cannot say that such appears to be the case here. It seems proper to say, however, that, for reasons which must be apparent to all, the better practice would be to try the main issue first, and, if then the plaintiff succeeds, there will be no necessity for a long and expensive trial of the question of damages, nor will the main question be obscured or confused by entirely immaterial testimony; while, if the defendant succeeds, the trial of the claim for damages can be immediately taken up and disposed of.

4. We proceed now to the main question in the case, namely, whether the evidence justifies the verdict to the effect that there was a valid and binding agreement of extension of the time of payment of the notes in suit. It appears from the evidence that the defendants owed the plaintiff bank $40,000 on the 22d day of May, 1895, and then gave the plaintiff security therefor, in the form of a bill of sale to one Perley Lowe, who held it for the bank, on 7,500,000 feet of logs in the river at Hawthorne, mixed with other logs of the defendants, and immediately afterwards secured an additional

thirty-day loan of $15,000 from the bank. Prior to October 29, 1895, the defendants had paid $7,500 upon the debt, and at that time some negotiations were had between the parties with reference to granting further time for payment, but the parties differ as to what was agreed upon. The defendants claim that it was then agreed that the defendants should turn over to the bank 4,000,000 feet of lumber at Hawthorne, valued at $8 per M., and $15,500 worth of logs in the river at the same place, which they were immediately to saw into lumber and pile in the yard, all of which lumber they were to sell to their customers, in the usual course of business, during the year 1896, and apply the proceeds to the payment of plaintiff's notes; that they were also to turn over to the plaintiff insurance policies on the lumber then in the yard to the amount of $32,000; and that, in consideration of this new agreement, the time of payment of the notes was orally extended until they could be paid out of the proceeds of the lumber. On the other hand, the plaintiff claims that there were negotiations pending for extension of the time of payment of the notes, and that there were certain conditions to be complied with on the part of the defendants with regard to the release of another claim upon part of the lumber which were never complied with, and that in fact no agreement of extension was ever consummated.

The radical difficulty with the defendants' claim is that, conceding all their testimony to be true, there is no agreement shown to extend the time of payment to any definite and certain time. The notes which are claimed to have been extended were not taken up. They were all payable at definite times, and, in order to extend them, it is plain that there must have been a binding agreement made, changing them, and extending the time of payment to some other definite and fixed time. Mere giving of time indefinitely will not avail. Brandt, Suretyship & G. (2d ed.), § 344. That the supposed extension of time here was to the last

degree indefinite and uncertain, and incapable of being reduced to certainty, is very clear from the evidence of the defendants themselves. *Mr. Badger*, who principally conducted the negotiations for the defendants, describes the arrangement as follows: "*Q.* You may state what was said and done between you and Mr. O'Dell at that interview with reference to the indebtedness. *A.* Well, there was quite a little conversation. Mr. O'Dell, among other things, said that we had not paid him quite as fast as he expected, and he wanted the matter now put in shape. He wanted to know if we had finished sawing, and then he wanted thirty-two thousand dollars' worth of lumber turned over to the bank, and thirty-two thousand dollars' worth of insurance, and the logs in the pond at Hawthorne for the sum of fifteen thousand five hundred dollars, and I agreed to it. I told him that we would do it, and we did so. There was a claim upon this lumber at the time we turned it out to the *Union National Bank.* We had given a bill of sale to McElwee & Carney. Mr. O'Dell said that he would want the lumber clear from the bill of sale to McElwee & Carney, and said that he knew that McElwee & Carney were willing to release the bill of sale on the lumber and take stumpage, and he wanted me to get them to do so, which I did. He wanted us to close it up as soon as possible. He said that he wanted it done right off. Mr. O'Dell said he thought it would be fair to take the lumber at nine dollars a thousand, and he got a paper, and made a memorandum, figuring how much it would take at nine dollars a thousand. I told him we had been shipping out of the stock right along; that the good lumber was sold. There was quite a little of what was called 'No. 4 boards,' and the balance,— I thought, four million feet,— at eight dollars a thousand, would be about right. He made a memorandum of that. I have the memorandum, and this paper is the memorandum made by him. *Q.* Was anything said between you and him at that time as

to what the figures represented,— that is, did he make any statement as to what the figures were for? *A.* Yes, sir; in substance, that was all that was said,— that he would recommend that the bank give us an opportunity to get the money out of the lumber and logs to pay the bank. . . . In reference to the selling of the lumber in the future, Mr. O'Dell said he thought we could sell the lumber better than anybody, and he wanted us to continue distributing it to our regular trade, and make payments to him, and if, at any time, that arrangement proved unsatisfactory, he would make some other arrangement, but for the present that should stand. He did not want to anticipate any change until it became necessary. After Mr. Lowe was at Hawthorne the bank sent a young man there by the name of Reed. He is there yet, I believe. He was to act as custodian for any logs and lumber that the *Union National Bank* was interested in at Hawthorne in the name of Perley Lowe. At the time the bill of sale was given in May, 1895, that arrangement was made, and Mr. Reed went to Hawthorne in May, 1895, and remained there ever since. . . . In this contract extension there was a particular time mentioned as to when these notes were extended. The time they were extended was as soon as the lumber could be shipped during the year 1896; there was no definite understanding as to the date of the time when they were extended more than it was to be shipped this year of 1896. We were to commence shipping in the spring, as fast as we could."

The defendant *Cross* testifies as follows as to the agreement: "Mr. O'Dell said he simply wanted thirty-two thousand dollars' worth of lumber, and, if there was more than thirty-two thousand dollars' worth of lumber, that that should be considered as ours, to use in our regular business, and the balance due was to be carried. The fifteen thousand five hundred dollars was to be carried until the logs could be converted into lumber that were in the stream.

There was conversation in regard to how the thirty-two thousand dollars' worth of lumber was to be handled in order to sell it. Mr. O'Dell said that he wanted to sell the lumber, and arrangements should be made as to how it might be handled, in detail, upon Mr. Lowe's return. *Mr. Badger* and myself both stated to him that we wanted the bank to feel that the money received from the lumber would be accounted for to them, and we told them that if they wanted to put a bookkeeper in our office, in their employ, to keep track of this part of the business, they could do so. We were willing to arrange it in any way that would be satisfactory to him. I think that was the substance of the conversation. Mr. O'Dell stated that that should be arranged upon Mr. Lowe's return, in detail, satisfactory to him. I think that was the substance of the conversation. There was something said about how the money was to be applied on the notes. As fast as received and turned over to the bank it was to be applied on the notes that we were owing the bank, and as soon as a note was paid that note was to be returned to us. . . . The arrangement about the bank taking this lumber, and how we were to sell it and account for it, was talked over. It was understood that the details were to be arranged as to how we were to sell and handle it after Mr. Lowe and *Mr. Badger* returned from Hawthorne, and it was understood that after they returned an arrangement would be made in reference to selling and accounting for the lumber, what was to be done with the proceeds, and how applied on our notes. It was said that the notes were to be carried, the time extended until this property could be sold and realized on and the proceeds applied to the payment of the notes. I cannot tell who used the word 'extension of time' or 'extended.' That is the way I understood the conversation there. I think the words were used by Mr. O'Dell and Mr. Lowe. I cannot state the conversation, word for word. The substance of the conver-

sation was that the money was to be applied on the pay-
ment of the notes, and the notes were to be held until this
lumber was sold,—until the logs were sawed out the next
season, and the lumber sold, and the proceeds received from
them to apply to the notes; that thirty-two thousand dol-
lars, being on lumber in the yard, of course to be paid first,
and the other would run along until late the next year, until
that lumber was sawed and dried. No definite time was
mentioned that the notes were extended to. Nothing in
regard to the period of time mentioned, except that it was
understood that it would be possibly May or June, 1896."

Upon this evidence it is entirely certain that no agreement
extending the time of payment to any definite time was ever
made. This is not such a case as that of *Moulton v. Posten*,
52 Wis. 169, where an agreement to extend payment until
after "threshing time" was held a sufficiently definite and
certain time of year to give the contract validity and bind
the creditor. The agreement here (if any was made) was
that the defendants were to continue selling the lumber as
fast as they could, in the regular course of business, and make
payments from the proceeds. There is no possible way of
determining when this could be accomplished, and hence the
supposed agreement is too vague and uncertain to be enforced.

5. An important question is raised as to the measure of
damages. As indicated in the statement of the case, a very
large portion of the property levied upon consisted of saw-
mill and planing-mill buildings and machinery (which were
personal property because situated upon leased land), together
with boom chains and sticks and other property necessary
for use in and about the mills. The defendants placed the
value of this property, prior to the levy of the attachment,
at from $31,500 to $34,000, and testified that the deprecia-
tion in the value thereof by reason of the attachment was
from $27,000 to $31,000. It does not appear that the prop-
erty had been damaged after the levy by wear and tear or

in any manner, but the witnesses based their estimates of depreciation principally upon the fact that the business was stopped. The witness *Badger* testified that the machinery was as good as before, but that the moment the attachment was levied fifty per cent. of the value was taken off, because it was a bankrupt institution; that it was damaged fifty per cent. because it was a bankrupt stock, and because the *reputation* of the concern was injured. The witness *Cross* testified substantially to the effect that the next day after the attachment the property was not worth within fifty per cent. of what it was the day before, by reason of the destruction of the business, and that he estimated the depreciation upon the fact that the property had been attached, and also by reason of the general depression in all business, and especially in the lumber business, during the time since the attachment was levied.

The charge of the court is not preserved in the bill of exceptions, but the verdict was based upon estimates of this character, and the question is raised, by objections taken to the evidence, whether such estimates form a proper basis for damages. In case of a wrongful levy upon a stock of goods kept for sale, which are afterwards returned to the owner, he may recover as part of the damages any depreciation in the value of his goods during the time they are held. *Anderson v. Sloane*, 72 Wis. 566; *Beveridge v. Welch*, 7 Wis. 465. The reason is plainly because the goods are kept for the purpose of sale, and, had they not been seized, they might have been sold at their value when seized; hence the depreciation in value may be properly said to be a reasonable and certain element of damages. But when property kept for use, and not for sale, is attached, the reason no longer holds good, because there is no presumption that the property would or could have been sold, but the presumption is to the contrary. It is settled by our own decisions that there can be no recovery for supposed loss of profits from the interruption of

business in a case of this kind. *Braunsdorf v. Fellner*, 76 Wis. 1. The authorities are quite uniform in holding that, in the absence of malice, injuries to credit, reputation, and business are too remote and speculative to be recovered. 2 Suth. Dam. (2d ed.), § 512. In the present case it is entirely apparent from the evidence that the buildings and machinery attached were in nearly, or quite, as good condition for use at the time of the trial as when seized, and would have been nearly, if not quite, as useful to any person desiring to operate such a business in that locality; and it is equally apparent that the estimate of depreciation made by the witnesses was in fact the supposed injury to the defendants' reputation and business by reason of the sudden stoppage of the business by the attachment. As frequently said by the witnesses, it had become a bankrupt concern instead of a going concern, and this was clearly the basis upon which they figured out the supposed almost complete wiping out of values. As said before, the buildings and machinery were nearly, or quite, as available for the manufacture of lumber, to one who could secure the necessary logs, at the time of the trial as at the time of the seizure. The damage was in the bankruptcy of the institution. The defendants were undoubtedly entitled, in case the attachment was wrongful, to recover for the loss of the use of their property while held by the officer, which, in ordinary cases like the present, would be measured by its rental value; and, if the property were shown to be damaged by wear or tear or negligent care in the hands of the officer, this also would be a proper element; but they are not entitled, under the guise of depreciation in value, to recover damages for injuries to their business, credit, and reputation resulting from bankruptcy.

Some objections were made to the form of the special verdict, but we do not consider them well taken.

*By the Court.*— Judgment reversed, and action remanded for a new trial.